U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED

2016 SEP -8 P 4: 26

JON W. SANFILIPPO
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.                                         Case No. 16-cr-14

YOUNIS MOHAMMED AL JAYAB,

Defendant.

## PLEA AGREEMENT

1. The United States of America, by its attorneys, Gregory J. Haanstad, Acting United States Attorney for the Eastern District of Wisconsin, and Paul L. Kanter, Assistant United States Attorney, and the defendant, Younis Mohammed Al Jayab, individually and by attorney Michael J. Steinle, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2. The defendant has been charged in four counts of a four-count indictment, which alleges violations of Title 18, United States Code, Sections 371, 2314, 2315, 21, and 2.

3. The defendant has read and fully understands the charges contained in the indictment. He fully understands the nature and elements of the crimes with which he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4. The defendant voluntarily agrees to plead guilty to the following count set forth in full as follows:

## COUNT ONE

**THE GRAND JURY CHARGES THAT:**

1. Between on or about September 17, 2014, and February 16, 2015, in the state and Eastern District of Wisconsin,

**YOUNIS MOHAMMED AL JAYAB,
SAMER MOHAMMED AL JAYAB, and
AHMED WALEED MAHMOOD,**

did knowingly and willfully conspire and agree to transport and receive in interstate commerce property of a value of $5,000 or more that the defendants believed, based upon official representation, to have been stolen in Illinois and transported to Wisconsin in violation of Title 18, United States Code, Sections 2314, 2315, and 21.

2. In furtherance of the conspiracy and to affect the objects of thereof, the following overt acts, among others, were committed:

(a) On or about September 17, 2014, in the State and Eastern District of Wisconsin, YOUNIS MOHAMMED AL JAYAB (hereinafter YOUNIS), met with an undercover FBI Special Agent and discussed the purchase by YOUNIS of two cellular telephones that were purported by the Agent to be stolen.

(b) On or about September 19, 2014, in the State and Eastern District of Wisconsin, YOUNIS met with the Agent and purchased two cellular telephones and a laptop computer, which were purported by the Agent to be stolen.

(c) On or about September 26 and September 28, 2014, in the State and Eastern District of Wisconsin, YOUNIS had a consensually monitored telephone call with the Agent to discuss the purchase of additional stolen telephones. YOUNIS sought to purchase 10 Apple iPhones.

2

(d) On or about October 5, 2014, in the State and Eastern District of Wisconsin, YOUNIS and SAMER MOHAMMED AL JAYAB (hereinafter SAMER) and AHMED WALEED MAHMOOD, purchased 10 Apple iPhones that were purported by the Agent to be stolen in Chicago, Illinois.

(e) On or about November 6, 2014, in the State and Eastern District of Wisconsin, YOUNIS and SAMER met with an undercover FBI Special Agent and purchased 10 Apple iPhones and a television that were purported by the Agent to be stolen in Chicago, Illinois.

(f) On or about February 16, 2015, in the State and Eastern District of Wisconsin, SAMER met with an undercover FBI Special Agent and purchased 10 Apple iPhones that were purported by the Agent to be stolen in Chicago, Illinois.

All in violation of Title 18, United States Code, Section 371.

5. The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts set forth in Attachment A beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

## PENALTIES

6. The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine: five years and $250,000. The count also carries a mandatory special assessment of $100, and a maximum of three years of supervised release. The parties further recognize that a restitution order may be entered by the court.

7. The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## DISMISSAL OF REMAINING COUNTS OF INDICTMENT

8. The government agrees to move to dismiss the remaining counts of the indictment at the time of sentencing.

## ELEMENTS

9. The parties understand and agree that in order to sustain the charge of conspiracy as set forth in count one, the government must prove each of the following propositions beyond a reasonable doubt:

First, that the conspiracy as charged existed;

Second, that the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy; and

Third, that one of the conspirators committed an avert act in an effort to advance the goal of the conspiracy.

## SENTENCING PROVISIONS

10. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12. The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth in paragraph 4.

4

The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13.	The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

14.	The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15.	The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

### Base Offense Level

16. The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in count one is 6 under Sentencing Guidelines Manual § 2B1.1(a)(2).

### Specific Offense Characteristics

17. The parties acknowledge and understand that the government will recommend to the sentencing court that a 4-level increase for loss under Sentencing Guidelines Manual § 2B1.1(b)(1)(C) is applicable to the offense level for the offense charged in count one.

### Acceptance of Responsibility

18. The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility.

### Sentencing Recommendations

19. Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

20. Both parties reserve the right to make any recommendation regarding any and all factors pertinent to the determination of the sentencing guideline range; the fine to be imposed; the amount of restitution and the terms and condition of its payment; the length of supervised release and the terms and conditions of the release; and any other matters not specifically addressed by this agreement.

21. The government agrees to recommend a sentence of five years' probation, which falls within the sentencing guideline range of 8 as calculated above.

## Court's Determinations at Sentencing

22. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

23. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

24. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full immediately upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule.

25. The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form.

## Special Assessment

26. The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

## Forfeiture

27. The defendant agrees that all properties listed in the indictment constitute the proceeds of the offense to which he is pleading guilty, or were used to facilitate such offense. The defendant agrees to the forfeiture of these properties and to the immediate entry of a preliminary order of forfeiture. The defendant agrees that he has an interest in each of the listed properties. The parties acknowledge and understand that the government reserves the right to proceed against assets not identified in this agreement.

## Buy Money

28. The defendant agrees to repay the government, jointly and severally with his codefendants, $17,757.41, the amount paid by the government to acquire the telephones sold to the defendants, as a condition of any term of probation imposed by the sentencing court.

## DEFENDANT'S COOPERATION

29. The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The government agrees to advise the sentencing judge of the nature and extent of the defendant's cooperation. The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

## DEFENDANT'S WAIVER OF RIGHTS

30.  In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

   a.  If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

   b.  If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

   c.  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

   d.  At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

   e.  At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

31.  The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights.

The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

32. The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

33. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

## Further Civil or Administrative Action

34. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

10

## MISCELLANEOUS MATTERS

35. The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which defendant is pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, and the defendant understands that no one, including the defendant's attorney or the sentencing court, can predict to a certainty the effect of the defendant's conviction on the defendant's immigration status. The defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences, including the potential for automatic removal from the United States. The defendant agrees not to contest any removal proceeding instituted as a result of his pleading guilty to the offense identified herein.

## GENERAL MATTERS

36. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

37. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

38. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

39. The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed.

The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

40. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

41. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 08/22/2016

YOUNIS MOHAMMED AL JAYAB
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 8-29-16

MICHAEL J. STEINLE
Attorney for Defendant

For the United States of America:

Date: 9/7/2016

GREGORY J. HAANSTAD
United States Attorney

Date: 9-7-2016

PAUL L. KANTER
Assistant United States Attorney

13

ATTACHMENT A

1. In May 2014, a reliable confidential source reported to the FBI that YOUNIS MOHAMMED AL JAYAB (YOUNIS) was involved in the sale and receipt of stolen merchandise in the City and County of Milwaukee, Wisconsin, with the intent of selling and shipping said merchandise overseas for a profit.

2. On September 17, 2014, FBI agents confirmed that YOUNIS was working at 27th St. Tobacco in Milwaukee, WI. An FBI Undercover Employee (UCE) (herein referred to as UCE-1) drove to the 27th St. Tobacco store wearing consensual audio and video recording devices. UCE-1 entered the store and offered to sell YOUNIS two Samsung Galaxy cellular telephones. UCE-1 advised YOUNIS that the phones were stolen. YOUNIS expressed interest in purchasing the phones as long as the price was right. YOUNIS inspected the phones and attempted to place his personal SIM card into the phone in order to activate it, but YOUNIS was unsuccessful. YOUNIS stated that he would purchase the phones if they were GSM standard unlocked cellular telephones. GSM stands for "Global System for Mobile" communications and is the network standard for much of the world. A GSM unlocked phone can operate overseas without further modification other than the insertion of any Subscriber Identity Module (SIM) card. If the phone is not GSM, the phones will not operate. Of the four major U.S. cellular carriers, only T-Mobile and AT&T wireless use GSM technology. UCE-1 told YOUNIS that he would return the following Friday with GSM unlocked phones. YOUNIS provided UCE-1 with his cellular telephone number ending 4341 to set up a future meet to purchase the stolen phones. All subsequent telephone communications between YOUNIS and UCE-1 were recorded.

3. On September 19, 2014, FBI agents observed YOUNIS working at the 27th St. Tobacco store in Milwaukee, WI. UCE-1 drove to the 27th St. Tobacco store, and while utilizing a consensual audio and video recording device, entered the store and offered two new Apple iPhones and one new Apple MacBook Pro (laptop) to YOUNIS. YOUNIS ensured the phones were operational and agreed to purchase them for $150 each. YOUNIS did not have $400 for the laptop and proceeded to negotiate with UCE-1 to purchase this item for $200.

4. YOUNIS purchased the three aforementioned items for $500 total. The total retail price for these new items is $2,531.22[1]. YOUNIS requested UCE-1 to provide 10 Apple iPhones at a later date and stated he would get his money in order. YOUNIS stated that he knew this activity was illegal (buying "stolen" phones) and that he sells the stolen phones overseas.

5. On September 26, 2014, UCE-1 had a consensually monitored telephone call with YOUNIS to discuss the purchase of stolen phones. YOUNIS sought to purchase 10 Apple iPhones for $1,000. During the conversation, UCE-1 informed YOUNIS that he and his cousin had been stealing merchandise off delivery trucks in Chicago, IL, for years. UCE-1 asked YOUNIS "who the boss is up there?" YOUNIS replied, "me and my cousin, he put the money with me so we can buy ten." UCE-1 asked if they wanted something other than just phones, such as televisions. YOUNIS replied, "I need a television for my house, come on, hook me up…a flat screen…like 50-52 inch."

6. On September 28, 2014, YOUNIS telephonically contacted UCE-1, who told YOUNIS that his cousin needed to know what to steal off the truck. YOUNIS requested ten (10) Apple iPhones and two laptop computers. YOUNIS reminded UCE-1 that the phones had to be GSM

---

[1] The FBI purchased all of the devices sold during the investigation from retail sources.

unlocked. YOUNIS also spoke with UCE-1 about getting a television off the truck for his personal use. YOUNIS stated to UCE-1: "Remember, this is illegal. You do not know me and I don't know you. You get your money and I'll get mine."

7. On September 30, 2014, U.S. Customs and Border Protection (CBP) intercepted a package with sender information, YOUNIS M. AL JAYAB, XXXX East Grange Ave. Apt. #X, Cudahy, WI, contact telephone number ending 4341. This is the same address listed on YOUNIS' Wisconsin driver's license and the same telephone number previously provided to UCE-1. The package was addressed to an individual in Romania. Upon inspection, CPB found that the package contained a Galaxy Samsung S4, Model SCH-I545. There was no memory or SIM card contained within the phone, but the registered phone number ended 4377, known to be the phone number of SAMER MOHAMMED AL JAYAB (SAMER).

8. On October 5, 2014, UCE-1 made telephonic contact with YOUNIS telling YOUNIS that he had the 10 Apple iPhones. YOUNIS instructed UCE-1 to meet him at the Wal-Mart located at 222 N. Chicago Avenue, South Milwaukee, WI. At that location, agents observed SAMER and AHMED WALEED MAHMOOD (MAHMOOD) walking in the Wal-Mart parking lot towards the store entrance. Shortly thereafter, YOUNIS, SAMER, and MAHMOOD approached UCE-1's undercover vehicle. UCE-1 was wearing a consensual audio and video recording device.

9. Agents observed YOUNIS shake hands with UCE-1 at the rear of the undercover vehicle. SAMER was observed walking away and then was observed driving a red Dodge Caravan through the Wal-Mart parking lot. SAMER parked the vehicle next to UCE-1's vehicle where UCE-1 was meeting with YOUNIS and MAHMOOD. UCE-1 told them that the items he was

3

selling were stolen. MAHMOOD stated five of the 10 Apple iPhones being sold were going to him. YOUNIS stated he chose to meet at this parking lot because it did not have video surveillance. YOUNIS and MAHMOOD purchased the 10 new Apple iPhones from UCE-1 for a price of $1,000. The retail price for these new items was $5,797.40. Thereafter, YOUNIS and MAHMOOD, along with an object suspected to contain the newly purchased phones, were observed entering the red Dodge Caravan driven by SAMER. The vehicle departed the area and drove directly from the Wal-Mart to YOUNIS' residence on E. Grange Ave, Cudahy, WI. YOUNIS, MAHMOOD, and SAMER were observed entering the residence.

10. Agents learned that YOUNIS visited an express mail facility located at on South 3rd Street, Milwaukee, WI, on October 7, 2014. Agents interviewed the mail clerk who assisted YOUNIS on this date. The clerk stated that YOUNIS attempted to ship two Samsung Galaxy cell phones to Romania and one Apple iPhone to Cyprus. A glitch in the mail facility's system, and YOUNIS's handwritten labels, prevented the packages from being sent on this date. YOUNIS told the clerk that he had shipped a package to Romania a few weeks earlier with no problems. A review of the store's surveillance video verified YOUNIS's presence at the express mail facility.

12. On October 7, 2014, CBP conducted an inquiry for any outbound international shipments by YOUNIS. According to that inquiry, YOUNIS sent: 1) on 5/28/2014, an "HTC ONE" (cell phone) valued at $100.00 to Cyprus; 2) on 7/1/2014, "phones" valued at $500.00 to Cyprus; 3) on 9/9/2014, "phone, nickels, ring, and watch" to Romania; and 4) on 9/30/2014, "phone" valued at $75.00 to Romania.

4

13. On November 6, 2014, UCE-1 spoke telephonically with YOUNIS regarding the purchase of Apple iPhones and televisions. UCE-1 told YOUNIS that he could not make the trip to Wisconsin at this time. However, UCE-1's cousin (UCE-2) would deliver the phones. YOUNIS was hesitant, but agreed to meet UCE-1's cousin at the Wal-Mart at 222 N. Chicago Avenue, South Milwaukee, WI.

14. On November 6, 2014, UCE-2 met YOUNIS and SAMER in the Wal-Mart parking lot and sold them 10 new Apple iPhones and a new 60" Sony flat screen television for $1,250.00. The retail price for the 10 new phones was $5,797.40, and $1,583.99 for the new television. UCE-2 helped YOUNIS and SAMER load the television into a green Pontiac Sunfire. SAMER took a black shoulder bag which contained the ten phones from UCE-2 and placed the bag into the rear seat of the Pontiac Sunfire. YOUNIS drove the Pontiac Sunfire with SAMER as passenger away from the Wal-Mart parking lot and directly to their residence on E. Grange Avenue, Cudahy, WI. SAMER carried the black shoulder bag with the phones, and YOUNIS carried the television, into the residence.

15. On November 7, 2014, UCE-2 received multiple text messages from YOUNIS, stating "I sold the merchandise already. When you think you can get some more?"

16. On December 9, 2014, agents observed YOUNIS travel to the South Milwaukee Post Office and mail a small parcel. After learning the package was bound for international shipment, the US Postal Inspection Service and CBP located the package. A review of the shipping label listed the recipient in Romania. The package contained one white Apple iPhone with gold accents, phone accessories, and jewelry. Additional review of the phone, upon turning it on, indicated that phone number ended 4341. The ESN and model number established that the

5

phone was one of the Apple iPhones purchased by YOUNIS and SAMER from UCE-2 on November 6, 2014.

17. By previous arrangement, on February 16, 2015, UCE-2 met SAMER at the Wal-Mart parking lot at 222 N. Chicago Avenue, South Milwaukee, WI. UCE-2 offered to sell and SAMER agreed to purchase five new Apple iPhones for $100.00 each. UCE-2 informed SAMER that he had five additional new Apple iPhones available for purchase. In the presence of UCE-2, SAMER telephonically contacted YOUNIS about the additional phones. Thereafter, SAMER paid UCE-2 $500.00 for the original five phones and departed the parking lot in a blue 2002 Toyota Celica registered to YOUNIS. Agents observed SAMER meet with YOUNIS several blocks from the Wal-Mart. SAMER returned to the Wal-Mart parking lot and paid UCE-2 an additional $500.00 for the five additional Apple iPhones. The retail price of these 10 new phones was $5,797.40.

18. In summary, UCE-1 and UCE-2 sold 32 new Apple iPhones, a new laptop computer, and a new television, with a total retail value of $21,507.41, to YOUNIS, SAMER, and MAHMOOD, who knowingly purchased the items believing they were stolen in Chicago, IL and transported to Milwaukee, WI.